1 | Robert D. Hoffman - State Bar No. 123458
**CHARLSTON, REVICH & WOLLITZ LLP**
2 | 1925 Century Park East, Suite 1250
Los Angeles, California 90067-2746
3 | Tel: (310) 551-7016 • Fax: (310) 203-9321
E-mail: rhoffman@crwllp.com
4 |
Attorneys for Plaintiff,
5 | AmTrust International Underwriters Limited

6

7

8 | **UNITED STATES DISTRICT COURT**

9 | **CENTRAL DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| AMTRUST INTERNATIONAL UNDERWRITERS LIMITED, an Irish corporation, | Case No. |
| Plaintiff, | **COMPLAINT OF AMTRUST INTERNATIONAL UNDERWRITERS LIMITED FOR DECLARATORY RELIEF RE NO INSURANCE COVERAGE FOR CERTAIN FEDERAL CLASS AND DERIVATIVE ACTIONS INVOLVING GROWLIFE, INC. AND RELATED PARTIES** |
| v. | |
| GROWLIFE, INC. a Delaware corporation; STERLING C. SCOTT, a California resident; JOHN GENESI, a California resident; MARCO HEGYI, a Washington resident; ROBERT E. HUNT, a Colorado resident; ERIC D. SHEVIN, a California resident; ALAN R. HAMMER, a New Jersey resident; ANTHONY J. CIABATTONI, a California resident; JEFFREY GIARRAPUTO, a California resident; JUSTIN MANNS, a California resident; ELISABETH WEDAM SCOTT, a California resident; CRAIG ELLINS, a Nevada resident and ROBERT KURILKO, a California resident, | |
| Defendants. | |

# I.   **INTRODUCTION**

1.     AmTrust International Underwriters Limited ("AmTrust") seeks a judicial determination that it has no duty to indemnify GrowLife, Inc. ("GrowLife") or any other entity or person pursuant to the Private Company Liability Coverage Part of The Elements insurance policy issued by AmTrust to GrowLife for the policy period July 21, 2013 to July 21, 2014 bearing policy No. EUC 1001330 00 ("Policy") for any amounts incurred with respect to the following five (5) consolidated securities fraud class action ("Class Actions") filed against GrowLife, a service provider for the cultivation of organics, herbs, greens and plant based medicines, including marijuana, and certain other parties (collectively "GrowLife Parties") in the United States District Court for the Central District of California that AmTrust is defending pursuant to the Policy under a reservation of rights:  (1) *Randy Romero, et al. v. GrowLife, Inc., et al.*, Case No. 2:14-cv-03015-CAS ("Romero Action"); (2) *Gerald Young, et al v. GrowLife, Inc., et al.*, Case No. 2:14-cv-03183-CAS ("Young Action"); (3) *Steve Roof v. Sterling C. Scott, et al.*, Case No. 2:14-cv-03777-CAS ("Roof Action"); (4) *Rochelle Wolf, et al. v. GrowLife, Inc., et al.*, Case No. 2:14-cv-04112-CAS ("Wolf Action") and (5) *Gary Rotenberg, et al. v. Sterling C. Scott, et al.*, Case No. 2:14-cv-6091-CAS ("Rotenberg Action").

2.     The complaints in the Class Actions alleged certain violations of federal securities laws on behalf of all persons and entities other than the named defendants who had purchased common stock of GrowLife between November 14, 2013 and April 9, 2014 ("Class Period") with the Rotenberg Action filed as a shareholder derivative action on behalf of GrowLife.  It was alleged in such complaints, among other things, that certain financial statements filed by GrowLife with the Securities and Exchange Commission ("SEC") contained material misstatements as to GrowLife's financial condition or business that allegedly artificially inflated or distorted GrowLife's stock price so as to allegedly deceive

1   the investing public.

2       3.     In the Class Actions, it was alleged that GrowLife's 10-Q Report for

3   the 3rd quarter of 2013 and10-K annual report for the year ended 2013 (collectively

4   "2013 SEC Statements") understated certain expenses of GrowLife by understating

5   the price of GrowLife common stock shares ("Stock Valuation Issue") paid by

6   GrowLife as compensation to certain of its directors and officers ("GrowLife

7   Insiders") and outside parties.  In connection with that claim, it was alleged that in

8   the 2013 SEC Statements such stock transactions were improperly valued and

9   expensed at prices lower than the market prices in effect on the dates that such

10   GrowLife shares were granted to the GrowLife Insiders so as to allegedly

11   understate such expenses and certain losses that had been incurred by GrowLife.  It

12   was alleged in the complaints in the Class Actions that defendants had violated

13   federal securities laws in connection with the Stock Valuation Issue.

14       4.     AmTrust seeks, and is entitled to obtain, a judicial declaration that no

15   indemnity coverage exists under the Policy for the entirety of the claims asserted in

16   the Class Actions ("Claims") and that AmTrust has no duty or obligation to

17   indemnify, pay for or reimburse GrowLife and/or any person or entity for any

18   amounts incurred to defend and/or to indemnify any of the Claims in the Class

19   Actions.

20       5.     In applying for the Policy, GrowLife responded "no" to a question in

21   the Knowledge/Warranty section of the application ("Application") that asked if the

22   applicant had any "knowledge or information of any facts or circumstances which

23   could reasonably be expected to give rise to a claim under the proposed policy?"

24   ("Circumstances Question").  Immediately below the Circumstances Question, it

25   was stated in the Application that "It is understood and agreed that any loss arising

26   from a matter disclosed **or which should have been disclosed** under this

27   section…of this application is excluded from coverage under the policy…"

28   ("Warranty Disclosure Exclusion")(emphasis added).

6.     AmTrust is informed and believes and thereon alleges that at the time that GrowLife applied for the Policy, GrowLife had knowledge or information that GrowLife's 10-K annual report for the year ended December 31, 2012 and 10-Q Report for the first quarter of 2013 (collectively "Pre-Application SEC Statements") that had been signed by GrowLife's CEO and CFO pursuant to certain requirements of the Sarbanes-Oxley Act of 2002 ("SOX") contained valuations of GrowLife common stock shares paid by GrowLife as compensation to the GrowLife Insiders and certain outside parties that were expensed at prices lower than the stock prices in effect on the dates the shares were granted to the GrowLife Insiders and such outside parties in the same alleged manner as the 2013 SEC Statements that are the subject of the Claims in the Class Actions.  The Policy defines "Application" to include all materials provided to the Company's underwriters with any application and any filings with the SEC in the 12 months preceding the inception date of the Policy.

7.     In connection with GrowLife's Application for the Policy, AmTrust's underwriters were provided with a copy of a spread sheet by GrowLife's insurance broker with an explanation of the calculation of paid in capital that appeared in GrowLife's 2013 first quarter 10-Q Report in response to a request for certain information contained in the Quotation for the Policy. AmTrust is informed and believes and thereon alleges that such spread sheet utilized valuations of GrowLife common stock shares paid as compensation to the GrowLife Insiders and certain outside parties from that 2013 first quarter 10-Q Report that had been expensed at prices lower than the stock prices in effect on the dates the shares were granted to GrowLife Insiders in the same manner as with the 2013 SEC Statements that are the subject of the Claims.

8.     AmTrust is informed and believes and thereon alleges that at the time that GrowLife applied for the Policy GrowLife had information or knowledge that the apparent understatement in the Pre-Application SEC Statements with respect to

the valuation of the GrowLife common shares paid as compensation to the GrowLife Insiders could reasonably be expected to result in an understatement of losses incurred by GrowLife as reported in such statements so as to give rise to claims pursuant to the D&O Coverage that GrowLife was seeking to obtain from AmTrust.

9.     AmTrust is informed and believes and thereon alleges that because the Stock Valuation Issue should have been disclosed in the Application in response to the Circumstances Question that the Warranty Disclosure Exclusion applies to the entirety of the Claims in the Class Action as such claims appear to arise out of the Stock Valuation Issue.

10.     AmTrust seeks a judicial declaration that no coverage exists under the Policy for the entirety of the Claims in the Class Actions pursuant to the Warranty Disclosure Exclusion such that AmTrust has no duty to pay for nor reimburse any amounts relating to the Class Actions.

## II.     THE PARTIES

11.     At all times herein mentioned, AmTrust was and is, a corporation organized and existing under the laws of the Republic of Ireland, with its principal place of business in the United States located in Cleveland, Ohio and is a citizen of Ireland and the State of Ohio.

12.     AmTrust is informed and believes, and thereon alleges, that at all times herein relevant, GrowLife was and is, a corporation organized and existing under the laws of the state of Delaware, with its principal place of business in California, from its formation until in or about July 2014 when it relocated its principal place of business to Seattle, Washington, and is a citizen of the States of Delaware and Washington.

13.     AmTrust is informed and believes, and thereon alleges, that at all times herein relevant, Sterling C. Scott was and is a resident domiciled in the State of

1   California and a citizen of the State of California.

2          14    AmTrust is informed and believes, and thereon alleges, that at all times
3   herein relevant, John Genesi was and is a resident domiciled in the State of
4   California and a citizen of the State of California.

5          15.    AmTrust is informed and believes, and thereon alleges, that at all times
6   herein relevant, Marco Hegyi was and is a resident domiciled in the State of
7   Washington and a citizen of the State of Washington.

8          16.    AmTrust is informed and believes, and thereon alleges, that at all times
9   herein relevant, Robert E. Hunt was and is a resident domiciled in the State of
10  Colorado and a citizen of the State of Colorado.

11         17.    AmTrust is informed and believes, and thereon alleges, that at all times
12  herein relevant, Eric D. Shevin was and is a resident domiciled in the State of
13  California and a citizen of the State of California.

14         18.    AmTrust is informed and believes, and thereon alleges, that at all times
15  herein relevant, Alan R. Hammer was and is a resident domiciled in the State of
16  New Jersey and a citizen of the State of New Jersey.

17         19.    AmTrust is informed and believes, and thereon alleges, that at all times
18  herein relevant, Anthony J. Ciabattoni was and is a resident domiciled in the State
19  of California and a citizen of the State of California.

20         20.    AmTrust is informed and believes, and thereon alleges, that at all times
21  herein relevant, Jeffrey Giarraputo was and is a resident domiciled in the State of
22  California and a citizen of the State of California.

23         21.    AmTrust is informed and believes, and thereon alleges, that at all times
24  herein relevant, Justin Manns was and is a resident domiciled in the State of
25  California and a citizen of the State of California.

26         22.    AmTrust is informed and believes, and thereon alleges, that at all times
27  herein relevant, Elisabeth Wedam Scott was and is a resident domiciled in the State
28  of California and a citizen of the State of California.

23.     AmTrust is informed and believes, and thereon alleges, that at all times herein relevant, Craig Ellins was and is a resident domiciled in the State of Nevada and a citizen of the State of Nevada.

24.     AmTrust is informed and believes, and thereon alleges, that at all times herein relevant, Robert Kurilko was and is a resident domiciled in the State of California and a citizen of the State of California.

## III.    JURISDICTION AND VENUE

25.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332(a)(1) in that the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different States, in that AmTrust is a corporation domiciled in Ireland with its principal place of business in the United States in Cleveland, Ohio, and thus a citizen of Ireland and the State of Ohio, whereas defendant GrowLife is a Delaware corporation with its principal place of business in Washington and a citizen of the States of Delaware and Washington and the individual defendants who had been named as defendants in the complaints in the Class Actions, Sterling C. Scott, John Genesi, Marco Hegyi, Robert E. Hunt, Eric D. Shevin, Alan R. Hammer, Anthony J. Ciabattoni, Jeffrey Giarraputo, Justin Manns, Elisabeth Wedam Scott, Craig Ellins and Bob Kurilko (collectively "Individual GrowLife Defendants") are as set forth above, citizens of the States of California, Washington, Colorado, New Jersey and Nevada. The amount in controversy is in excess of the sum of $75,000, exclusive of interest and costs in that GrowLife and certain of the Individual GrowLife Defendants seek to be indemnified pursuant to the Policy for amounts incurred in connection with the Class Actions, including but not limited to, legal fees and costs incurred for the defense of the Class Actions in excess of the $100,000 Retention under the terms of the Policy.

{00098009.DOCX 1}

26.     Pursuant to 28 U.S.C. §1391(a), venue is appropriate in the Central District of California because jurisdiction is founded upon diversity of citizenship, with the defendants named herein subject to personal jurisdiction in this district at the time this action was commenced as parties to the Class Actions, and the acts giving rise to the claims for relief asserted herein, including those being litigated in the Class Actions arose in the Central District of California.

## IV.   **FACTUAL BACKGROUND**

### A.   **THE APPLICATION FOR THE POLICY**

27.     On June 27, 2013, E.L.M. Insurance Brokers, Inc. ("E.L.M."), on behalf of GrowLife, requested a quotation for public directors and officers coverage ("D&O Coverage") from AmTrust for GrowLife and provided a submission to AmTrust's underwriters at Euclid Executive Liability Managers ("Euclid") that included copies of GrowLife's 2013 10-Q for the 3rd quarter and a completed Liberty Private Advantage Policy Application for Insurance ("Application"). AmTrust had not previously issued any insurance policies of any type to GrowLife.

28.     A true and correct copy of the Application, without attachments, is attached hereto as Exhibit "A" and incorporated herein by this reference.  Certain financial information in the Application has been redacted.

29.     The Application required GrowLife to provide information in response to certain questions in a section entitled "Prior Knowledge/Warranty" that including the Circumstances Question as follows:

Does any insured individual or insured entity have any knowledge or information of any    Yes ❏    No ❏
facts or circumstances which could reasonably be expected to give rise to a claim under
the proposed policy?    Yes ❏    No ❏

If yes, please 'provide full details

It is understood and agreed that any loss arising from a matter disclosed or which should have been disclosed under this section 11 of this application is excluded from coverage under the policy, all without limiting any other remedy available to Liberty International Underwriters for non-disclosure.

30.    AmTrust is informed and believes and thereon alleges that the Application was signed on or about June 26, 2013 by Scott Hughes ("Hughes") as an "agent" of GrowLife.

31.    The Application submitted to Euclid that had been signed by Hughes on behalf of GrowLife contained a response of "No" to the Circumstances Question.

32.    On or about July 7, 2013, Euclid issued a Quotation for D&O Coverage from AmTrust that requested certain information from GrowLife to explain certain paid in capital figures in GrowLife's 2013 3rd Quarter 10-Q filed with the SEC:

This proposal is subject to the receipt of the additional information requested below:

1. Explanation of how paid in capital went from $2.6 M at 12/31/12 to $4.3M at 3/31/13 even though they only raised $500 K.

33.    A true and correct copy of the Quotation issued by Euclid on July 7, 2013 on behalf of AmTrust for proposed D&O Coverage for GrowLife for the proposed policy period of July 21, 2013 to July 21, 2014 is attached hereto as Exhibit "B" and incorporated herein by this reference. Certain proprietary information contained in the Quotation has been redacted.

34.    On August 8, 2013, E.L.M. provided Euclid with a copy of a spreadsheet ("GrowLife Spreadsheet") that purported to provide information on GrowLife's financial condition in connection with the increase of paid in capital between 2012 and 2013 that had been requested in the Quotation.

35.     A true and correct copy of the GrowLife Spreadsheet that was provided by E.L.M. to Euclid on August 8, 2013 in response to the request for information in the Quotation is attached hereto as Exhibit "C' and incorporated herein by this reference.

## B.     THE POLICY ISSUED TO GROWLIFE

36.     In August 2013, in reliance upon the truth and accuracy of the contents and representations contained in the Application, the materials submitted to Euclid in connection with the Application, including but not limited to, the GrowLife Spreadsheet and the SEC statements filed by GrowLife in the preceding twelve (12) months, AmTrust issued the Policy to GrowLife for the policy period July 21, 2013 to July 21, 2014.

37.     A true and correct copy of the Policy is attached hereto as Exhibit "D" and incorporated herein by this reference. Certain proprietary information with respect to the premium for the Policy has been redacted.

38.     Section II.A. of the General Terms and Conditions Section ("General Terms Section") of the Policy contains the following definition of "Application":

### II. DEFINITIONS

The following terms whenever set forth in boldface type in this policy, whether in singular or in plural, shall have the meanings indicated. Any other terms set forth in boldface type in the general Terms and Conditions will have the meanings indicated in the applicable **Coverage Element.**

A. **Application** means
    (i)    the signed application for this policy, if any; all applications for any policy of which this policy is a renewal or replacement; and all applications which it may succeed this policy in time including any attachments thereto; and
    (ii)   other materials or information submitted to or relied upon by the **Insurer** in connection with the underwriting of this policy, including but not limited to any filings made by the **Company** to the Securities Exchange Commission or any similar state, local, or foreign governmental entity, within the 12 months preceding the inception date of this policy. The materials defined in (i) and (ii) above shall be deemed attached to and part of this policy.

39.     Section XI of the General Terms Section of the Policy provides in part as follows:

**XI. REPRESENTATIONS AND SEVERABILITY**

In granting coverage under this policy, it is agreed that the **Insurer** has relied upon the statements and representations contained in the **Application** for this policy as being accurate and complete. All such statements and representations are the basis of this policy and are to be considered as incorporated into this policy.

\*   \*   \*

40.     Section V. of the Directors and Officers and Private Company Liability Coverage Element ("D&O Form") of the Policy contains, in part, the following provisions regarding the payment of the Retention under the Policy:

**V. Retentions**

The following provisions shall apply in addition to the provisions of Section V. Retentions of the General Terms and Conditions:
A. The **Insurer** shall only be liable for the amount of **Loss** arising from a **Claim** which is in excess of the applicable Retention set forth in Item 4 of the Directors and

Officers and Private Company Liability **Coverage Element** Declarations. The Retention shall be borne by the **Insureds** and shall remain uninsured.

B. A single Retention shall apply to **Loss** arising from all **Claims** alleging the same **Wrongful Act** or **Related Wrongful Acts**.

41.     Pursuant to Item 4 of the Declarations to the D&O Form of the Policy, a single $100,000 Retention applies to Securities Claims under the D&O Form.

## C.     THE CLAIMS IN THE CLASS ACTIONS

### 1.     The Romero Action

42.     On April 18, 2014, the complaint ("Romero Complaint") was filed in the Romero Action that contained claims for relief against GrowLife and certain of the Individual GrowLife Defendants for violations of Section 10(b) of the Exchange

1    Act and Rule 10b-5 and Section 20(a) of the Exchange Act.

2         43.   It was alleged in the Romero Complaint, among other things, that the

3    2013 SEC Statements contain material misrepresentations as to the valuation of

4    shares of GrowLife common stock used to pay for services rendered by certain of

5    Grow Life's officers, directors and certain third parties and that such stock shares

6    were allegedly expensed at understated values in those statements.

7         44.   It was alleged in ¶ 25 of the Romero Complaint that GrowLife's 2013

8    3rd quarter 10-Q and accompanying SOX certifications had been signed by

9    defendants Scott and Genesi "falsely attesting to the accuracy of the 2013 3Q 10-

10   Q."

11        45.   It was alleged in ¶ 31 of the Romero Complaint that GrowLife's 2013

12   10-K and accompanying SOX certifications had been signed by defendants Scott

13   and Genesi "falsely attesting to the accuracy of the 2013 3Q 10-K."

14        46.   It was alleged in ¶ 34 of the Romero Complaint that on April 10, 2014,

15   one day after the announcement that defendant and GrowLife Board Member

16   Shevin had resigned from GrowLife's Board that the SEC "announced the

17   temporary trading suspension of the Company's stock" ("SEC Announcement")

18   that stated in part as follows:

19        The U.S. Securities and Exchange Commission announced the temporary

20        suspension, pursuant to Section 12(k) of the Securities Exchange Act of 1934

21        (the "Exchange Act"), of trading of the securities of GrowLife, Inc.

22        ("PHOT"), of Woodland Hills, California at 9:30 a.m. EDT on April 10,

23        2014, and terminating at 11:59 p.m. EDT on April 24, 20:14.

24        The Commission temporarily suspended trading in the securities of PHOT

25        because of questions that have been raised about the accuracy and adequacy

26        of information in the marketplace and potentially manipulative transactions

27        in PHOT's common stock

28        47.   It was alleged in ¶ 36 of the Romero Complaint that on the same date

as the April 10, 2013 SEC Announcement, analyst Rolling O Research "published a report revealing alleged inaccuracies with the Company's SEC filings" ("Rolling Report").

48. It was also alleged in ¶ 36 of the Romero Complaint that the Rolling Report stated in part the following:

> [L]et's just look at the three December 31, 2013 payments to the three newest directors, Hammer, Ciabattoni and Giarraputo. **They were awarded a total, of 227,777 shares, which the company valued at $4,555 for expense purposes. Yet, at the December 31 closing price of $0.151, those shares should have resulted in a charge of $34,394. For these three directors alone, it appears that PHOT is understating its expenses by nearly $30 thousand.**
>
> Looking at the Subsequent Event "future charges" shown above, the understatement would be even more astounding, due to the increase in PHOT's stock price during the quarter (assuming this is not corrected in the 10-Q for 1Q/14). **On March 31, 2014, PHOT closed at $0.5795. Therefore, the 500 thousand share payments to each of the four directors, while being listed by Growlife, as $40 thousand expense (at $0.02), should be recorded as a $1.159 million charge. That's a difference of $1.1M!**

(Emphasis in original).

49. It was alleged in ¶42 of the Romero Complaint that during the Class Period the individual named defendants allegedly "engaged in a scheme to deceive the market and a course of conduct that artificially inflated GrowLife's stock price and operated as a fraud or deceit on purchasers of GrowLife stock by misrepresenting the Company's business."

50. It was alleged in ¶42 of the Romero Complaint that "as a result of their purchases of GrowLife stock during the Class Period, Plaintiff and other members of the Class suffered economic loss."

51. It was alleged in ¶ 47 of the Romero Complaint that "common questions of law and fact exist as to all members of the Class" including as to "whether statements made by the Individual Defendants to the investing public

during the Class Period misrepresented and/or omitted material facts about the business, prospects and operations of GrowLife."

### 2.   The Young Action

52.   On April 25, 2014, the complaint ("Young Complaint") was filed in the Young Action that contained claims for relief against GrowLife and certain of the Individual GrowLife Defendants for violations of Section 10(b) of the Exchange Act and Rule 10b-5 and Section 20(a) of the Exchange Act.

53.   The Young Complaint contained allegations that the 2013 SEC Statements misrepresented the value of shares of GrowLife common stock paid to certain GrowLife officers and directors as compensation.

54.   It was alleged in ¶ 28 of the Young Complaint that certain statements in the 2013 SEC Statements regarding the valuation of such shares of stock paid to GrowLife officers and directors as compensation "were materially false and/or misleading when made because defendants failed to disclose or indicate the following:  (1) that the Company had provided inaccurate and/or inadequate information about its stock and engaged in potentially manipulative transactions; (2) that the Company lacked adequate internal and financial controls; and (3) that, as a result of the foregoing, the Company's statements about GrowLife's business operations, and prospects were materially false and misleading at all relevant times."

55.   The Young Complaint alleged that the valuations of GrowLife common stock paid to GrowLife officers and directors as compensation that appear in the 2013 SEC Statements had been misstated so as to allegedly distort the price of GrowLife shares to the alleged damage of the proposed class of purchasers of GrowLife common stock during the Class Period.

56.   It was alleged in ¶¶ 18 and 23 of the Young Complaint that the 2013

1   SEC Statements and SOX certifications thereto had been signed by Scott and

2   Genesi that allegedly "reaffirmed" GrowLife's financial results and financial

3   positions" set forth in those statements.

4               **3.**    **The Roof Action**

5

6        57.    On May 15, 2014, the complaint ("Roof Complaint") was filed in the

7   Roof Action that contained claims for relief against GrowLife and certain of the

8   Individual GrowLife Defendants for willful breach of fiduciary duty and duty of

9   loyalty, abuse of control, unjust enrichment, breach of fiduciary duties for insider

10  selling and misappropriation of information.

11       58.    The Roof Complaint contained allegations that the 2013 SEC

12  Statements misrepresented the value of shares of GrowLife common stock paid to

13  certain GrowLife officers and directors as compensation.

14       59.    It was alleged in ¶ 26 of the Roof Complaint that the value of common

15  shares of GrowLife paid to certain GrowLife directors was misreported in the 2013

16  10-Q for the 3rd quarter of 2013 as follows:  "By valuing the shares issued to

17  directors at far below current market prices, Defendants camouflaged, misreported

18  and understated the actual value of the above payments by a factor of twenty – or

19  close to a half million dollars."

20       60.    It was alleged in ¶ 27 of the Roof Complaint that "this same method of

21  underreporting payments of stocks to insiders by valuing the payments at far below

22  current prices, was a modus operandi utilized by Defendants to conceal from

23  investors, the general public and the SEC their transfer of millions of dollars in

24  unearned and inappropriate payments to themselves."

25       61.    It was alleged in the Roof Complaint that the 2013 10-K Report filed

26  by GrowLife with the SEC also contained the same alleged method of

27  underreporting payments of stock payments to insiders by allegedly valuing the

28  payments at below current market prices.

62.     It was alleged in ¶ 28 of the Roof Complaint that GrowLife's 2013 3rd Quarter 10-Q was signed by Scott and that the SOX certification that accompanied that filing had been separately executed "falsely attesting to the accuracy of the 2013 3Q 10-Q."

63.     It was alleged in ¶ 33 of the Roof Complaint that GrowLife's 2013 10-K was signed by Scott and that the SOX certification that accompanied that filing had been separately executed "falsely attesting to the accuracy of the 2013 10-K."

64.     It was alleged in ¶ 50 of the Roof Complaint that "All the Individual Defendants face a sufficiently substantial likelihood of liability to render them interested since, as detailed below, the Individual Defendants had full knowledge that the payments they received were unearned and improper and were being misreported and concealed from shareholders, the SEC and the general public through intentionally false and misleading statements in the Company's 2013 10-K."

### 4.     The Wolf Action

65.     On May 29, 2014 the complaint ("Wolf Complaint") was filed in the Wolf Action that contained claims for relief against GrowLife and certain of the Individual GrowLife Defendants for violations of Section 10(b) of the Exchange Act and Rule 10b-5 and Section 20(a) of the Exchange Act.

66.     It was alleged in ¶ 10 of the Wolf Complaint that throughout the Class Period, defendants made false and misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations and financial position.

67.     It was alleged in ¶¶ 10 and 40 of the Wolf Complaint that "defendants made false and/or misleading statements and/or failed to disclose:  (1) Defendants had valued the Company's shares issued to Company insiders at far below then-

current market prices, and concealed and underreported the actual value of such payments; (2) Defendants had provided inaccurate and/or inadequate information in the Company's SEC filings about the stock based compensation it paid to its current and former officers and directors; (3) Defendants' improper valuations of stock-based compensation to insiders caused the Company's publicly reported financials to be materially misstated and in violation of Generally Accepted Accounting Principles; (4) Defendants had engaged in manipulative transactions involving the Company's common stock; (5) the Company lacked adequate internal controls and controls over its financial reporting; and (6) as a result of the foregoing, the Company's statements about GrowLife's business, operations and prospects were materially false and misleading at all relevant times."

68.     It was alleged in ¶ 11 of the Wolf Complaint that "as a result of Defendants' material misstatements and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant economic harm."

69.     In ¶ 30 of the Wolf Complaint, it was alleged that the valuation of GrowLife common stock shares paid to insiders at GrowLife that appeared in GrowLife's 10-Q for the third quarter of 2013 "were materially false and misleading because Defendants had valued the Company's shares issued to directors at far below current market prices" and allegedly "concealed and underreported the actual value of the above payments by a factor of twenty (20), or close to half a million dollars."

70.     It was alleged in ¶ 31 of the Wolf Complaint that the SOX certification that accompanied GrowLife's 2013 3rd Quarter 10-Q filing had been separately executed by defendants Scott and Genesi "which falsely attested to the accuracy of the statements" contained in that filing.

71.     In ¶ 35 and ¶ 38 of the Wolf Complaint, it was alleged that the valuation of GrowLife common stock shares paid to insiders at GrowLife that

appeared in GrowLife's 10-K for the year ended December 31, 2013 "were materially false and misleading because Defendants had valued" such shares "at far below" then-current market prices.

72.     It was alleged in ¶ 32 of the Wolf Complaint that the SOX certification that accompanied GrowLife's 10-K Report for the year ended December 31, 2013 that allegedly had attested to the accuracy of that SEC filing had been signed by certain of the individual named defendants.

### 5.     The Rotenberg Action

73.     On August 13, 2014, the complaint ("Rotenberg Complaint") was filed in the Rotenberg Action that contained claims for relief derivatively on behalf of GrowLife against certain of the Individual GrowLife Defendants and nominally against GrowLife for violations of Section 10(b) of the Exchange Act and Rule 10b-5 and Section 20(a) of the Exchange Act,  breach of fiduciary duty for disseminating false and misleading information, breach of fiduciary duties for failing to maintain internal controls, unjust enrichment, breach of fiduciary duties for insider selling and misappropriation of non-public information, abuse of control and gross mismanagement.

74.     In ¶ 47 of the Rotenberg Complaint, it was alleged that the valuation of GrowLife common stock shares paid to insiders at GrowLife that appeared in GrowLife's 10-Q report for the third quarter of 2013 "were materially false and misleading because Defendants had valued the Company's securities issued to directors at far below current market prices" and the alleged "difference in value in the aggregate was approximately $500 thousand."

75.     It was alleged in ¶ 48 of the Rotenberg Complaint that accompanying GrowLife's 2013 3rd Quarter 10-Q were separately executed SOX certifications by defendants Scott and Genesi allegedly "falsely attesting to the accuracy of the

1   statements contained in the filing."

2       76.   In ¶¶ 52 and 55 of the Rotenberg Complaint, it was alleged that the

3   valuation of GrowLife common stock shares paid to insiders at GrowLife that

4   appeared in GrowLife's 2013 10-K annual report "were materially false and

5   misleading" because defendants had allegedly valued the Company's securities

6   issued to such insiders directors at "far below" then "current market prices" and

7   then allegedly "concealed and underreported the actual value of such payments."

8       77.   It was alleged in ¶ 49 of Rotenberg Complaint that the SOX

9   certification that accompanied GrowLife's 10-K Report for the year ended

10   December 31, 2013 that allegedly had certified the accuracy of that SEC filing had

11   been signed by certain of the individual named defendants.

12       78.   It was alleged in ¶ 57 of the Rotenberg Complaint that the 2013 SEC

13   Statements "were materially false and misleading when made because Defendants

14   failed to disclose or indicate the following:  (1) that Defendants had valued the

15   Company's shares issued to Company Insiders at far below then-current market

16   prices, and concealed and underreported the actual value of such payments; (2) that

17   Defendants had provided inaccurate and/or inadequate information in the

18   Company's SEC filings about the stock based compensation it paid to its current

19   and former officers and directors; (3) that Defendants' improper valuations of

20   stock-based compensation to Insiders caused the Company's publicly reported

21   financials to be materially misstated and in violation of Generally Accepted

22   Accounting Principles; (4) that Defendants had engaged in manipulative

23   transactions involving the Company's common stock; (5) that the Company lacked

24   adequate internal controls over its financial reporting; and (6) as a result of the

25   foregoing, the Company's statements about GrowLife's business, operations and

26   prospects were materially false and misleading at all relevant times."

27

28

1

## D.      THE PRE-APPLICATION SEC STATEMENTS

2

3      79.    AmTrust is informed and believes and thereon alleges that the Pre-

4  Application SEC Statements contained certain statements regarding the valuation of

5  GrowLife common stock share paid to GrowLife officers and directors as

6  compensation that utilized an approach to valuation that does not appear to reflect

7  the fair market value of such shares at the time they were granted to such officers

8  and directors.

9      80.    AmTrust is informed and believes and thereon alleges that the

10  valuation of GrowLife common stock share paid to GrowLife officers and directors

11  as compensation in the Pre-Application SEC Statements involves the same

12  valuation approach with respect to the Stock Valuation Issue as that used for the

13  2013 SEC Statements that is the subject of the Claims in the Class Actions against

14  the GrowLife Parties.

15      81.    AmTrust is informed and believes and thereon alleges that the Pre-

16  Application SEC Statements were signed by Scott and Manns who allegedly

17  attested to the accuracy of the contents of those statements.

18

19              **FIRST CLAIM FOR RELIEF**

20          **(Declaratory Relief As to All Defendants)**

21

22      82.    AmTrust refers to the foregoing paragraphs 1 through 81 and

23  incorporates the same herein by this reference.

24      83.    AmTrust is informed and believes, and thereon alleges, that GrowLife

25  failed to accurately respond to the Circumstances Question in the Application by

26  responding "No" to that question and not disclosing to AmTrust that the Pre-

27  Application SEC Statements had not valued the GrowLife common stock shares

28  paid to officers and directors and other third parties as compensation at fair market

1  value at the time that such stock shares were granted so as to expose GrowLife to

2  potential claims by investors that such compensation and the overall loss of

3  GrowLife was understated in GrowLife's filings with the SEC.

4       84.    AmTrust is informed and believes and thereon alleges that the line

5  item in the GrowLife Spreadsheet labeled "Services" appears to incorporate the

6  same share-based compensation amounts reported in GrowLife's 10-Q report for

7  the quarter ended March 31, 2013.

8       85.    AmTrust is informed and believes that the GrowLife Spreadsheet

9  provided to Euclid in response to a request in the Quotation for certain information

10  on GrowLife's financial condition, had not valued the GrowLife common stock

11  shares paid to officers and directors and other third parties as compensation at fair

12  market value at the time that such stock shares were granted so as to expose

13  GrowLife to potential claims by investors that such compensation and the overall

14  loss of GrowLife was understated in GrowLife's filings with the SEC.

15       86.    AmTrust is informed and believes and thereon alleges that at the time

16  the Application was submitted to Euclid the officers of GrowLife who signed the

17  Pre-Application SEC Statements had knowledge or information that the Stock

18  Valuation Issue could reasonably be expected to give rise to a claim pursuant to the

19  Policy being applied for by GrowLife that the valuation of common stock paid to

20  the GrowLife Insiders allegedly had been understated so as to allegedly cause the

21  stated losses of GrowLife in those statements to be understated.

22       87.    AmTrust is informed and believes and thereon alleges that the Stock

23  Valuation Issue should have been disclosed by GrowLife in response to the

24  Circumstances Question in the Application.

25       88.    AmTrust is informed and believes and thereon alleges that Claims in

26  the Class Action involve the same Stock Valuation Issue with respect to the 2013

27  SEC Statements that appears to exist in the Pre-Application SEC Statements and

28  the GrowLife Spreadsheet.

89.     AmTrust is informed and believes and thereon alleges that because the Claims in the Class Actions arise out of the Stock Valuation Issue of which GrowLife officers had knowledge at the time the Application was submitted to Euclid to obtain the Policy, the Warranty Disclosure Exclusion applies to the entirety of the Claims in the Class Actions so as to preclude any coverage under the Policy for those claims.

90.     An actual controversy has arisen, and now exists, between AmTrust and the defendants in this action in that AmTrust contends, and is informed and believes that the defendants deny, that by virtue of the foregoing, that the Warranty Disclosure Exclusion applies to the entirety of the Claims in the Class Actions such that no potential or actual insurance coverage exists under the Policy as to any person or entity with respect to the claims in the Class Actions, and that AmTrust has no duty or obligation to pay for or reimburse any amounts incurred by any person or entity relating to the Class Actions.

WHEREFORE, AmTrust prays for judgment as follows:

1.     For a declaration that no potential or actual coverage exists under the Policy for the entirety of the Claims in the Class Actions;

2.     For a declaration that AmTrust has no duty or obligation to indemnify, pay for, or reimburse any person or entity for any amounts incurred by any person or entity relating to the Class Actions, including but not limited to, any amounts incurred to defend the Class Actions and/or any amounts awarded to any plaintiffs in the Class Actions and/or incurred to settle any claims in the Class Actions or for any other form of indemnity payment;

3.     For a declaration that AmTrust has no duty or obligation to defend and indemnify any claims against any person or entity who qualifies as an **Insured**, or who claims to qualify as an **Insured**, under the Policy with respect to the Class Actions; and

1        4.    For such other and further relief as the Court deems appropriate.

2                    Respectfully submitted,

3    DATED:  October 20, 2014      CHARLSTON, REVICH & WOLLITZ LLP
4                    ROBERT D. HOFFMAN

5

6                    By: /s/ Robert D. Hoffman
7                        Robert D. Hoffman
                  Attorneys for Plaintiff,
8                    AmTrust International Underwriters Limited

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28